[Cite as *State v. Martin*, 2014-Ohio-4447.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 14AP-189 |
| | | (C.P.C. No. 13CR-5354) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Iramac S. Martin, | : | |
| Defendant-Appellant. | : | |

# D E C I S I O N

## Rendered on October 7, 2014

*Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee.

*Richard Cline & Co., LLC*, and *Richard A. Cline*, for appellant.

### APPEAL from the Franklin County Court of Common Pleas.

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Iramac S. Martin, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which appellant was found guilty of aggravated robbery and robbery.

{¶ 2} On October 8, 2013, appellant was indicted on one count of aggravated robbery, in violation of R.C. 2911.01, and two counts of robbery, in violation of R.C. 2911.02. Prior to trial, on motion of plaintiff-appellee, State of Ohio, the trial court dismissed Count 3 of the indictment (third-degree felony robbery).

{¶ 3} The matter came for trial before a jury on Counts 1 and 2 beginning February 3, 2014. The first witness for the state was James Taylor, age 30. Taylor, an

employee of the Limited Brands in Reynoldsburg, typically works third-shift hours from 8:30 p.m. to 5:00 a.m.   On September 27, 2013, Taylor arrived at work at 8:30 p.m. Because of a lack of work on that date, Taylor's employer released him from work early, at approximately 11:30 p.m.

{¶ 4}   Taylor utilized the Central Ohio Transit Authority ("COTA") bus line for transportation between his home and work, and that evening he took a bus from the Limited Brands to the downtown area, intending to transfer to another COTA bus.  Upon arriving downtown, Taylor learned that the last available bus had already left.  Taylor was carrying $60 at the time and needed more cash for a cab ride home.  He walked to a nearby ATM bank machine, located near the intersection of High Street and Broad Street, and withdrew $40 from the machine.

{¶ 5}   While standing near the ATM machine, Taylor heard "someone from my right side" asking: "Can I get $5"?  (Tr. Vol. I, 42.)  Taylor "ignored" the person, "withdrew the money and proceeded to walk over to the bus stop."  (Tr. Vol. I, 42.)  Taylor described this individual, who he later identified as appellant, as a black male, wearing a black and red hat with the letter "C" on it.  (Tr. Vol. I, 43.)  The man had "a really long goatee and he was wearing a * * * red-and-white checkered shirt, and he had grills, silver teeth, something silver in his mouth."  (Tr. Vol. I, 42.)  The man was also wearing black pants and black shoes.  Taylor estimated the individual was approximately 5 foot 7 inches tall, weighing between 150 to 160 pounds, and between 21 to 25 years of age.

{¶ 6}   As Taylor stood near the bus stop, the man continued to ask him for money. Taylor eventually agreed to give him a dollar, and he reached into his pocket and handed the man a dollar bill.  Taylor then phoned a cab but the man "wouldn't leave," and Taylor "started getting uncomfortable."  (Tr. Vol. I, 44.)

{¶ 7}   Taylor walked to the next bus stop located a short distance away.  The man then came "kind of fast behind" Taylor and "put something" against Taylor's upper back and neck area.  (Tr. Vol. I, 44.)  The man told Taylor to "give me what you got, give me everything."  (Tr. Vol. I, 44.)  Taylor asked the man: "What are you talking about"?  (Tr. Vol. I, 44.)  The man said: "Dude, I don't want to kill you.  Give me everything that you got."  (Tr. Vol. I, 44.)  The man reached into Taylor's left pocket.  Taylor started to move and the man said: "Bro, bro, I don't want to kill you.  I'm in a bad place right now."  (Tr.

Vol. I, 45.)  At that point, Taylor reached into his right pocket, pulled out his wallet and the man "saw the money and he took it all."  (Tr. Vol. I, 45.)

{¶ 8}    Taylor, who was carrying a book bag that evening, reached into the bag for a stun gun he kept in the front pouch for protection.  Taylor pulled out the case and "pushed the button," producing a spark and causing the man to jump and move back.  (Tr. Vol. I, 48.)  Taylor then "went at him with it.  That's when he ran.  And [Taylor] kind of chased him down the street."  (Tr. Vol. I, 48.)  The man "kept running and looking back," heading north on High Street, and then proceeding west "around the corner on Gay Street."  (Tr. Vol. I, 48.)

{¶ 9}    Taylor walked back to his book bag and phoned the police.  A police officer soon arrived, and Taylor gave the officer a description of the man; approximately six minutes later, the officer told Taylor that officers had apprehended a suspect matching the description.  The officer drove the victim up the street to where officers had detained appellant.  Officers at the scene took appellant out of a police cruiser, and Taylor testified: "When they took him out I * * * recognized him right away, but he didn't have his hat." (Tr. Vol. I, 49.)  Taylor told the officer "that was him."  (Tr. Vol. I, 50.)  Taylor recognized him by "the long goatee, the checkered shirt and his face."  (Tr. Vol. I, 50.)

{¶ 10} At trial, Taylor identified appellant as the individual who took $100 from his wallet.  Taylor identified State's exhibit No. 17 as the hat worn by the assailant that evening.  During Taylor's testimony, the state introduced video captured by COTA security cameras on the night of the incident; Taylor identified himself and appellant as appearing on the surveillance video.  The state also introduced several photographs taken of appellant after his arrest.  Taylor stated that the photographs depicted the clothing appellant was wearing at the time of the robbery.

{¶ 11} Columbus Police Officer Kimberly Hollander was on duty during the early morning hours of September 28, 2013 and responded to a dispatch reporting a robbery. The officer spoke with the victim, who reported that a man had taken $100 from him; the victim last observed the man near Gay Street.  Officer Hollander testified the victim described the suspect as a black male, 5 foot 7 inches tall, "thin, a long goatee, silver teeth, * * * red-and-white plaid shirt and jeans."  (Tr. Vol. I, 87.)  A short time later, Officer Hollander received information that a police officer had stopped a suspect matching the

description.  Officer Hollander drove Taylor to a location near the intersection of Rich and High Streets where officers had detained appellant.  Officer Hollander rolled down the window of the cruiser and Taylor, after observing the suspect, told the officer "that is the person."  (Tr. Vol. I, 89.)

{¶ 12} Columbus Police Officer Ronnie Lucas was on patrol when he received a dispatch regarding a robbery, including a description of a suspect.  The officer observed a man matching that description walking southbound on High Street.  Officer Lucas turned his vehicle around but when he came back up the street he no longer saw the man.  Officer Lucas proceeded southbound on High Street and "caught a glimpse of him [lying] on a COTA bus bench" near the intersection of Rich and High Streets.  (Tr. Vol. I, 96.)  The officer stopped his vehicle, drew his weapon and asked the suspect to "show * * * his hands."  (Tr. Vol. I, 96.)  The suspect "got a little belligerent, and shortly thereafter other officers arrived, handcuffed him, put him in the cruiser."  (Tr. Vol. I, 96.)

{¶ 13} Columbus Police Officer Wesley Williams received a dispatch regarding a robbery in the vicinity of High and Broad Streets; the officer subsequently received information that officers had detained a suspect.  Officer Williams and Columbus Police Officer Brian Feldhaus began searching the area of High Street on foot, looking for a possible weapon.  Officer Feldhaus subsequently discovered a knife inside a recycling receptacle located near the front of the Palace Theater on Broad Street.  The knife was found "in the middle" of the recycling bin "by itself."  (Tr. Vol. I, 111.)

{¶ 14} On the date of the incident, Columbus Police Officer Edward Powell was working a special duty assignment at a bar located at 40 Long Street.  Officer Powell was dressed in a street uniform, and stood near the front door as patrons waited to enter the bar.  At approximately 11:45 p.m. that evening, the officer observed appellant outside the bar.  Specifically, appellant "came up to the front door and didn't want to pay the cover charge, so he had some verbal altercation with the door person at the bar and he argued for a couple of minutes about how he knew the owner and didn't want to pay the cover."  (Tr. Vol. I, 116-17.)  Appellant continued to argue about the $30 cover charge, and Officer Powell "asked for his ID because I was going to issue a criminal trespassing warning."  (Tr. Vol. I, 117.)  The officer returned appellant's identification information to him and told appellant "he needed to move on, and he did."  (Tr. Vol. I, 117.)  Approximately 15 minutes

later, Officer Powell heard a radio dispatch of a robbery suspect, and the description "matched [appellant's] description to a T," including the "clothing he was wearing," as well as the "scruffy beard and silver gold teeth in his mouth." (Tr. Vol. I, 120.)

{¶ 15} Columbus Police Detective Todd Cress investigated the robbery incident and interviewed Taylor who told the detective he had observed "a small black metallic object" in appellant's hand at the time of the incident. (Tr. Vol. I, 127.) At trial, the state introduced, as exhibit No. 14, a black, metallic knife recovered by police officers from a recycling bin. Detective Cress took photographs of appellant following his arrest. The detective testified that the clothing appellant was wearing matched the clothing described by Taylor. Appellant was also wearing "[f]rontals," which the detective described as "like false teeth you put over top of your teeth. It's usually gold or silver." (Tr. Vol. I, 133.) At the time he was detained, appellant was wearing a hat, which the state introduced at trial as State's exhibit No. 17. Police officers also recovered $67 from appellant.

{¶ 16} At the close of the state's evidence, appellant made a Crim.R. 29 motion for judgment of acquittal as to both the aggravated robbery count and the robbery count, which the trial court denied. Following the presentation of evidence, the jury returned verdicts finding appellant guilty of both counts. By judgment entry filed February 28, 2014, the trial court merged the two counts and sentenced appellant to three years incarceration on Count 1 (aggravated robbery). The court also ordered appellant to pay restitution in the amount of $33.

{¶ 17} On appeal, appellant sets forth the following assignment of error for this court's review:

> The trial court erred in denying Defendant's Criminal Rule 29 Motion for Acquittal of the Aggravated Robbery and Robbery charges because insufficient evidence existed to show that Defendant committed the offenses charged. Alternatively, the Aggravated Robbery and Robbery convictions were against the manifest weight of the evidence.

{¶ 18} Under his single assignment of error, appellant asserts the trial court erred in denying his Crim.R. 29 motion for judgment of acquittal. Alternatively, appellant contends that his convictions are against the manifest weight of the evidence.

{¶ 19} Crim.R. 29(A) states in part: "The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment

of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses."  A motion for acquittal under Crim.R. 29 "challenges the legal sufficiency of the evidence." *State v. Carter,* 2d Dist. No. 21145, 2006-Ohio-2823, ¶ 40.  Further, such motion "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence."  *State v. Tenace,* 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.  In reviewing the "record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *Id.,* quoting *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 20} In contrast to a sufficiency argument, a reviewing court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact." *State v. Vasquez,* 10th Dist. No. 13AP-366, 2014-Ohio-224, ¶ 49.  Rather, an appellate court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*

{¶ 21} R.C. 2911.01 sets forth Ohio's aggravated robbery statute.  Pursuant to R.C. 2911.01(A)(1), "[n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."  Appellant's conviction for robbery was based on R.C. 2911.02(A)(2), which states in part: "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, attempt to inflict, or threaten to inflict physical harm on another."

{¶ 22} In challenging the sufficiency of the evidence to support his convictions, appellant focuses on the evidence presented by the state with respect to issues of identity and the deadly weapon element of aggravated robbery.  As to the issue of identity, appellant cites the fact that Taylor did not mention that appellant had a tattoo on his left cheek near his eye, as well as a tattoo on his neck.  Appellant further argues that police

officers, while recovering $67 from appellant, never accounted for the remaining $33 that was reportedly stolen from the victim.

{¶ 23} In considering appellant's sufficiency challenge as to identity, the record reveals the following evidence presented by the state. The victim described the man who robbed him as a black male, 5 foot 7 inches in height, weighing approximately 150 to 160 pounds. The suspect was wearing a red and white checkered shirt, dark pants, black shoes, and a black hat with the letter "C" displayed. The individual had a "long goatee" and "something silver in his mouth," which Taylor identified as "grills." (Tr. Vol. I, 42.)

{¶ 24} Shortly after Taylor contacted police, a police dispatcher aired a description and police officers apprehended appellant in the general vicinity of the robbery. A police officer drove Taylor to the area where the officers had detained appellant, and Taylor positively identified him as the individual who committed the robbery. The state introduced photographs taken of appellant at the time, depicting a black male with a goatee, wearing a red and white checkered shirt, dark pants, and black shoes. At trial, Taylor identified appellant as the individual who robbed him. Here, construing the evidence most strongly in favor of the state, as we are required to do in considering a sufficiency argument, the prosecution presented evidence sufficient to establish appellant's identity as the individual who committed the robbery.

{¶ 25} Appellant challenges the identity testimony as against the manifest weight of the evidence on the basis that the victim failed to mention appellant had a tattoo on his face. As noted by the state, however, a review of State's exhibit Nos. 8 and 9, photographs taken by the detective of appellant shortly after his arrest, reveal that the "teardrop" tattoo near appellant's right eye is not easily discernible. With respect to the neck tattoo, the detective noted that appellant was wearing a shirt with a collar at the time of his arrest.

{¶ 26} As noted above, in addressing appellant's sufficiency argument, Taylor provided a detailed description of the suspect to police officers, and made a positive identification of appellant shortly after the incident; he also identified appellant at trial as the individual who robbed him. In light of the photographic evidence submitted, it is reasonable to infer that the victim may not have noticed the small tattoo near appellant's eye, or the tattoo on appellant's neck due to the shirt collar. Based on our review of the

record, we are unable to conclude that the victim's failure to identify appellant's facial or neck tattoos rendered the identification evidence unreliable.

{¶ 27} Appellant further contends the evidence was insufficient to establish aggravated robbery with a deadly weapon. He similarly challenges the manifest weight of the state's evidence as to aggravated robbery, asserting alleged discrepancies regarding the purported weapon used in the robbery.

{¶ 28} In considering the sufficiency of the evidence of a deadly weapon necessary to constitute the aggravated robbery offense, the state presented testimony by Taylor that appellant came up behind him and put a black metallic object against his back and neck area during the robbery. Taylor further testified that appellant stated: "I don't want to kill you. Give me everything that you got." (Tr. Vol. I, 44.) Shortly after the incident, the detective interviewed Taylor, who told the detective the assailant had "a small black metallic object" in his hand during the robbery. (Tr. Vol. I, 127.) During the interview, the detective asked Taylor: "Was it like a gun or something? And [Taylor] said: Yes." (Tr. Vol. I, 74.) At trial, Taylor testified that he did not know what the object was "right away" when appellant put the object to his back, "but when I turned a little bit and I was able to get a look and I saw, I remember it was black and it was a gun. I saw the barrel and it was metallic." (Tr. Vol. I, 72.) At trial, the state admitted as an exhibit a black metallic knife, found by police officers in the vicinity of the crime.

{¶ 29} R.C. 2923.11(A) defines "[d]eadly weapon" to mean "any instrument, device, or thing capable of inflicting death, and designed or specifically adapted for use as a weapon, or possessed, carried, or used as a weapon." As noted by the state, either a knife or a gun would be sufficient to satisfy the definition of a deadly weapon for purposes of aggravated robbery. *See, e.g., State v. Rogers,* 8th Dist. No. 77723 (Nov. 16, 2000) (evidence that defendant either used knife in his possession as a simulated gun during the robbery or, in the alternative, discarded a real gun during his attempted escape, sufficient to support conviction for aggravated robbery). Here, testimony by the victim, stating that appellant placed a gun against his neck and back during the robbery, if believed, was sufficient to establish the deadly weapon element of aggravated robbery under R.C. 2911.01(A)(1).

{¶ 30} Appellant also contends the manifest weight of the evidence fails to support the deadly weapon element of aggravated robbery, claiming a discrepancy in the state's evidence as to whether the assailant had a knife or gun. Appellant cites the victim's testimony that the assailant possessed a gun, while noting that the state's theory was that the robber must have used the knife found by officers to commit the robbery. Appellant further contends the evidence failed to link the knife admitted at trial to the assailant.

{¶ 31} As to evidence regarding the knife, part of the state's theory of the case was that appellant, after robbing Taylor, initially fled north on High Street, but then proceeded west on Gay Street, and then backtracked south (on Wall Street) past the area where police officers recovered a black, metallic knife in an empty recycling bin. As noted under the facts, Taylor testified that appellant ran north on High Street, and then turned west, "around the corner on Gay Street." (Tr. Vol. I, 48.) The state also presented evidence that police officers discovered a knife in that vicinity (i.e., in a recycle bin on Broad Street), approximately one block south of Gay Street. Police officers subsequently arrested appellant further south of that location, near the intersection of High and Rich Streets.

{¶ 32} Upon consideration of the record, we find the state presented evidence permitting the trier of fact to reasonably infer that appellant, after initially fleeing north, turned back and proceeded south past the area where the officers recovered the knife. Further, the jury could have found that the victim was mistaken as to his belief that the "small black metallic object" he observed in appellant's hand during the robbery was a gun (instead of a knife), and concluded that the knife admitted as evidence (i.e., a small black, metallic object), recovered by police officers in the vicinity of the crime, was the weapon used to facilitate the robbery. While appellant claims there was a lack of credible evidence linking the knife to the crime, we note that appellant did not challenge the admissibility of the knife at trial. Further, given the description by the victim of a small black metallic object, similar in size and color to the knife found by police officers, it was within the province of the jury to consider the probative value of such evidence. Accordingly, we find appellant's conviction for aggravated robbery is not against the manifest weight of the evidence.

{¶ 33} Finally, appellant points to the fact that police officers recovered only $67 from appellant following his arrest and that the state never accounted for the remaining

$33 allegedly taken from the victim.  However, the fact some of the money taken during the robbery was not recovered does not render the evidence presented insufficient to support the guilty verdict.  *See, e.g., State v. Newbern,* 10th Dist. No. 03AP-977, 2004-Ohio-3694, ¶ 20 (appellant's claim that no money or weapon was recovered does not establish evidence was insufficient to convict).  Rather, testimony by the victim that appellant, after placing a weapon against his neck and back, reached into his wallet and took all of the money inside was sufficient to support the conviction for aggravated robbery.

{¶ 34} Based on this court's review of the record, we find the state presented sufficient, competent, credible evidence to support the convictions.  Further, we conclude the trier of fact did not lose its way and create a manifest miscarriage of justice in finding appellant guilty of the offenses and, therefore, the convictions are not against the manifest weight of the evidence.  Accordingly, the trial court did not err in denying appellant's Crim.R. 29 motion for acquittal.

{¶ 35} Based on the foregoing, appellant's single assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

KLATT and LUPER SCHUSTER, JJ., concur.

_____